The RAILROAD COMMISSION OF TEXAS, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Association of American Railroads, Intervenor.

No. 84–1180.

United States Court of Appeals, District of Columbia Circuit.

Argued March 7, 1985.

Decided June 21, 1985.

J. Scott Wilson, Austin, Tex., with whom David R. Richards, Austin, Tex., was on brief, for petitioner. Walter Davis, Austin, Tex., entered an appearance for petitioner.

H. Glenn Scammel, Atty., I.C.C., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Robert S. Burk, Acting Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I.C.C., John J. Powers, III and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents. Lawrence H. Richmond and John Broadley, Attys., I.C.C., Washington, D.C., entered appearances for respondents.

Betty Jo Christian, Washington, D.C., with whom Stephen Ailes, J. Thomas Tidd and Samuel M. Sipe, Jr., Washington, D.C., were on brief, for intervenor Ass'n of American RR. Charles G. Cole and Steven Reed, Washington, D.C., entered appearances for intervenor.

William L. Slover, C. Michael Loftus, John H. LeSeur and Kelvin J. Dowd, Washington, D.C., were on brief for amicus curiae, Western Coal Traffic League, urging reversal of the I.C.C.'s decision in Ex Parte No. 388 (Sub-No. 31).

Before WRIGHT, MIKVA and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This action is brought by the Railroad Commission of Texas ("Railroad Commission" or "RCT") challenging a decision of the Interstate Commerce Commission denying RCT the requisite certification under federal law for a state authority to be empowered to regulate intrastate rail traffic. The Railroad Commission raises both procedural issues and the substantive claim that the ICC's decision is arbitrary, capricious and an abuse of agency discretion. Finding no merit to the claims of procedural error and concluding that the ICC's decision was amply justified, we deny the petition for review.

## I

A principal change wrought by the Staggers Rail Act of 1980, 49 U.S.C. §§ 10101 *et seq.* (1982), was the curtailment of the right of the several States to regulate intrastate rail traffic. Under the Staggers Act, States which sought to continue their regulation of intrastate rail commerce were required to apply, within 120 days of the Act's effective date, to the Interstate Commerce Commission submitting the standards and procedures which they intended to employ in exercising their desired regulatory authority. The ICC was then to certify, within ninety days of the application, any State the standards and procedures of which were determined to be in accordance with the standards and procedures employed by the ICC in its own regulatory activity. If no concordance of regulatory standards and procedures obtained, then the ICC was duty bound to deny certification; at the same time, the States were permitted to reapply for certification by submitting new standards and procedures which comported with federal standards. *See* 49 U.S.C. §§ 11501(b)(1), (2), (3).

Within the statutory 120-day application period, forty States filed for certification, each expressing the intent to follow the requisite federal standards and procedures. The ICC determined, however, that none of the States had adequately explained how they proposed to translate their good intentions into conforming standards and procedures; in addition, the Commission took note of various instances of conflicts between federal standards and the proposed state standards. *See* Ex Parte No. 388, *State Intrastate Rail Rate Authority— P.L. 96–488,* 364 I.C.C. 881, 882–83 (1981). Despite the shortcomings in the States' submissions, the ICC elected not to deny certification but instead choose to certify provisionally the forty applicant States while requiring them to submit revised standards and procedures. Thirty-six States submitted further filings, but the Commission's concerns were still not laid entirely to rest. Finding that serious issues remained for resolution, the ICC set out further guidelines and extended the provisional certification of the thirty-six applicants. *See* Ex Parte No. 388, *State Intrastate Rail Rate Authority—P.L. 96– 488,* served Feb. 8, 1982.

The Railroad Commission of Texas was one of the thirty-six state entities which enjoyed this extended post-Staggers Act authority, pursuant to the ICC's provisional certification, to regulate intrastate rail commerce. Like its sister authorities, however, the Railroad Commission did not enjoy exclusive regulatory dominion over intrastate traffic; to the contrary, its decisions were directly appealable to the ICC. *See* 49 U.S.C. § 11501(c). The ICC asserts, and RCT does not deny, that during the period of provisional certification some forty RCT decisions rejecting contracts between railroads and shippers were appealed to the ICC and reversed.[1] From the ICC's

---

1. *See, e.g.,* No. 39404, *Petition of the Atchison, Topeka & Santa Fe Ry. Co. for Review of an Order of the RCT,* served Aug. 12, 1983; No. 39435, *Petition of the Southern Pac. Transp. Co. for Review of an Order of the RCT,* served Sept. 7, 1983, *appeal docketed sub nom. State of Texas v. United States,* No. 83–4681 (5th Cir. Nov. 1, 1983); No. 39474, *Petition of the Southern Pacific Transp. Co. for Review of an Order of the RCT,* served Sept. 12, 1983, *appeal docketed sub nom. State of Texas v. United States,* No. 83– 4682 (5th Cir. Nov. 1, 1983); No. 39526, *Petition of the Southern Pac. Transp. Co. for Review of an Order of the RCT,* served Oct. 11, 1983; Nos. 39553, 39554, 39555, 39556, and 39557, *Petitions of Southern Pac. Transp. Co. and St. Louis S.W. Ry. Co. for Review of an Order of the RCT,* served Oct. 18, 1983, *appeal docketed sub nom. State of Texas v. United States,* No. 83–4770 (5th

Cir. Dec. 12, 1983); No. 39580, *Petition of the Southern Pac. Transp. Co. for Review of an Order of the RCT,* served Nov. 3, 1983, *appeal docketed sub nom. State of Texas v. United States,* No. 83–4793 (5th Cir. Dec. 22, 1983); No. 39593, *Petition of Missouri Pacific R.R. Co. for Review of an Order of the RCT,* served Nov. 18, 1983, *appeal docketed sub nom. State of Texas v. United States,* No. 84–4026 (5th Cir. Jan. 13, 1984); No. 39597, *Petition of the Missouri Pacific R.R. for Review of an Order of the RCT,* served Nov. 22, 1983, *appeal docketed sub nom. State of Texas v. United States,* No. 84–4028 (5th Cir. Jan. 13, 1984); No. 39620, *Petition of Burlington Northern R.R. Co. for Review of the Rail Rate Board of the RCT,* served Jan. 9, 1984, *appeal docketed sub nom. State of Texas v. United States,* No. 84–4147 (5th Cir. Mar. 5, 1984); No. 39650, *Petition of the Atchison, Topeka & Santa*

standpoint, the Railroad Commission of Texas, in a word, steadfastly refused to bring its own standards and procedures into conformity with federal standards, as plainly required under the Staggers Act regime. Many of the ICC's reversals of these numerous Railroad Commission decisions laid down explicit warnings to the RCT that its decisions failed to conform to federal requirements, that the RCT's good faith in complying with applicable federal law had thus been drawn into question by its dogged insistence on marching to its own interpositionist tune, and that this unbending spirit could adversely affect the Railroad Commission's application for certification.[2] Undaunted by all this, the RCT appealed many of the adverse ICC decisions to the United States Court of Appeals for the Fifth Circuit arguing, *inter alia,* that the ICC's interpretations were not binding on Texas because they were mere

agency rules which did not rise to the majestic level of explicit provisions of the Staggers Act. In the two Fifth Circuit decisions rendered prior to argument in this case, the Railroad Commission had departed New Orleans without vindication, for in both instances the Fifth Circuit upheld the ICC.[3]

In the summer of 1982, the ICC moved into the final decisional phase in a certification process that Congress had optimistically intended would last for only 120 days. Taking Illinois as the lead case, the ICC tentatively concluded that Illinois had satisfied federal certification requirements and would therefore be certified, unless contrary comments were submitted demonstrating that Illinois should not enjoy such ICC-sanctioned authority. *See* Ex Parte No. 388, *State Intrastate Rail Rate Authority—P.L. 96–488,* 365 I.C.C. 855 (1982).

*Fe Ry. Co. for Review of an Order of the RCT,* served Feb. 17, 1984, *appeal docketed sub nom. State of Texas v. United States,* No. 84–4230 (5th Cir. Apr. 9, 1984); No. 39657, *Petition of the Missouri Pac. R.R. Co. for Review of an Order of the RCT,* served Mar. 2, 1984, *appeal docketed sub nom. State of Texas v. United States,* No. 84–4231 (5th Cir. Apr. 9, 1984); No. 39663, *Petition of Southern Pac. Transp. Co. for Review of an Order of the RCT,* served March 9, 1984, *appeal docketed sub nom. State of Texas v. United States,* No. 84–4309 (5th Cir. May 9, 1984); No. 39675, *Petition of the Missouri Pac. R.R. Co. for Review of an Order of the RCT,* served Mar. 15, 1984, *appeal docketed sub nom. State of Texas v. United States,* No. 84–4323 (5th Cir. May 14, 1984); No. 39677, *Petition of the Missouri Pacific R.R. Co. for Review of an Order of the RCT,* served Mar. 14, 1984, *appeal docketed sub nom. State of Texas v. ICC,* No. 84–4310 (5th Cir. May 9, 1984); Nos. 39700 and 39701, *Petition of the Southern Pacific Transp. Co. and the Missouri-Kansas-Texas R.R. Co. for Review of an Order of the RCT,* served Apr. 5, 1984, *appeal docketed sub nom. State of Texas v. ICC,* No. 84–1206 (D.C.Cir. May 29, 1984). The ICC cites twenty-five additional petitions against RCT. *See* Respondent's Brief 8–13.

**2.** *See, e.g.,* No. 39588, *Petition of the Southern Pacific Transportation Company Under 49 U.S.C. 11501 for Review of an Order of the Railroad Commission of Texas* 3–4, served Nov. 9, 1983 ("[T]his continuing and repetitive series of RCT decisions and resulting railroad petitions for relief must and will be evaluated in terms of its effect on the pending application [for certifica-

tion].... In making certification determinations, we must rely, in some measure, on evidence of a State's good faith as well as its specific rules and regulations. The nonconformity of RCT's contract rules has been addressed by this Commission repeatedly. We must begin to question RCT's good faith in establishing and following standards and procedures 'in accordance with the standards and procedures applicable to regulation of rail carriers by the Commission under this title.'") (quoting 49 U.S.C. § 11501(b)(3)(A)); No. 39620, *Petition of Burlington Northern Railroad Company Under 49 U.S.C. § 11501 for Review of an Order of the Rail Rate Board of the Railroad Commission of Texas* 3–4, served Jan. 9, 1984 (similar language).

**3.** *See State of Texas v. United States,* 730 F.2d 409 (5th Cir.1984), *modified on rehearing,* 749 F.2d 1144 (5th Cir.1985); *State of Texas v. United States,* 730 F.2d 420 (5th Cir.1984). It bears noting that the opinions in these cases were handed down after the denial of certification that forms the basis for this appeal.

The Railroad Commission also challenged the constitutionality of the Staggers Act sections preempting regulation by non-certified States. The constitutionality of those provisions was upheld in *State of Texas v. United States,* 730 F.2d 339 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). This court last year reached the same conclusion. *See Illinois Commerce Comm'n v. Interstate Commerce Comm'n,* 749 F.2d 875, 885–87 (D.C.Cir. 1984), *petition for cert. filed,* 53 U.S.L.W. 3854 (U.S. June 4, 1985) (No. 84–1829).

Illinois was duly certified in January of the following year. *See* Ex Parte No. 388, *State Intrastate Rail Rate Authority— P.L. 96–488,* 367 I.C.C. 149 (1983). After the Illinois decision, several other States were also certified. *See* Ex Parte No. 388 (Sub-Nos. 2, 29, 30, 35), *State Intrastate Rail Rate Authority—Arkansas, South Carolina, Tennessee, West Virginia,* served Feb. 22, 1984; Ex Parte No. 388 (Sub-No. 33), *Intrastate Rail Rate Authority—Virginia,* served July 27, 1983. On the other hand, several other States had their provisional certifications extended as the ICC was unwilling at that stage to come fully to rest on their respective applications. *See, e.g.,* decisions cited *infra* note 7.

■ When the time came to consider the Railroad Commission's submission, the Lone Star State suffered the indignity of being the first—and as of oral argument, the only—State to be denied certification. While earlier decisions postponing final consideration and requesting refiling had included an extension of provisional certification, the ICC's final decision denying Texas certification contained no such extension, thus leaving the Texas regulatory apparatus entirely out in the cold. *See* Ex Parte No. 388 (Sub-No. 31), *State Intrastate Rail Rate Authority—Texas,* served Apr. 20, 1984. The ICC concluded:

> Texas' redress of specific problems that we set forth in [Ex Parte No. 388, *State* ] *Intrastate Rail* [*Rate Authority—P.L. 96–488,* served Feb. 8, 1982] is inadequate and its address of the general subject areas we outlined is incomplete. Furthermore, Texas has staunchly refused to comply with Federal law as expressed in this Commission's decisions (rule-making and adjudicatory), and has consistently flouted our rules.... Based

on this evidence, we find that Texas' standards and procedures are wholly deficient and that it is unwilling to regulate intrastate rail rates· in accordance with Federal law. We find that Texas' application for certification must be denied.

> Furthermore, it would be contradictory to the spirit of [the applicable] section ... to allow provisional certification to continue where there is wholesale abrogation of so many key provisions of the Staggers Act and of our decisions (rule-making and adjudicatory), where Federal standards and procedures are so grossly ignored or violated, and where a State clearly will not use continued provisional certification to bring its standards and procedures into compliance with Federal law. We find that Texas' provisional certification must be revoked.

*Id.* at 21.[4]

In one sense, the ICC's adverse decision was final; it brought to a close Texas' filing for certification, denied the application for certification, and as a result, terminated the State's provisional certification. But in another sense, the decision does not forever leave Texas behind, as it were, with the train having pulled out of the station; to the contrary, Texas may resubmit new standards and procedures to the ICC, and if the new submission is adequate, then the RCT will join the growing ranks of certified state authorities. *See* 49 U.S.C. § 11501(b)(3)(A). Texas must come forward only with the demonstration of regulatory fidelity to federal standards as required by the Staggers Act, but its interim period of regulatory authority has of course long since expired. The upshot of all this is that Texas now must demonstrate compliance with federal law *before* it may regulate.

---

**4.** As discussed more fully *infra* note 5, the ICC's purported revocation of provisional certification is more accurately viewed as the legal expiration of an interim certification based on the denial of final certification. Properly viewed, the ICC's decision should be interpreted as a refusal to extend provisional certification rather than a revocation of the earlier provisional certification. This mere mislabelling of what was, as we shall see, a fully supported agency action does not invoke the well-settled doctrine of *Securities & Exchange Comm'n v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), namely, that judicial review of an agency action must rest solely on the justification offered by the agency.

## II

In its petition for review, the Railroad Commission advances several procedural challenges to the ICC's decision. RCT argues that the Commission (1) was required to provide Texas with a formal hearing but failed to do so; (2) improperly considered evidence outside the record; (3) failed to provide proper notice of the potential outcome of its decision; and (4) violated the Government in the Sunshine Act, 5 U.S.C. § 552b (1982).

### A

■ We first address the contention that the Railroad Commission was due a formal hearing. RCT invokes a particular statutory provision, 49 U.S.C. § 11501(f), which provides that the "Commission may take action ... under this section only after a full hearing ...." The RCT contends that this provision requires a formal hearing. We disagree. A fundamental and well-recognized distinction exists between a requirement that an agency provide a "hearing" and a requirement that an agency provide a "hearing on the record." Formal proceedings do not attach to a requirement of a "hearing;" such proceedings would obtain only on the requirement of a "hearing on the record." *See United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 234, 93 S.Ct. 810, 816, 35 L.Ed.2d 223 (1973) (" 'after hearing' was not the equivalent of a requirement that a

rule be made 'on the record after opportunity for an agency hearing' "); *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 757, 92 S.Ct. 1941, 1950, 32 L.Ed.2d 453 (1972) ("Sections 556 and 557 [of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*] need be applied 'only where the agency statute, in addition to providing a hearing, prescribes explicitly that it be "on the record." ' ") (quoting *Siegel v. Atomic Energy Comm'n*, 400 F.2d 778, 785 (D.C.Cir.1968)); *United States Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 536 (D.C.Cir.1978) (formal hearing provisions not applicable "unless Congress has clearly indicated that the 'hearing' required by statute must be a trial-type hearing on the record") (citations omitted). The fact that the pertinent statute here calls for a "full hearing" does not alter our conclusion. *See Farmers Union Central Exchange, Inc. v. F.E.R.C.*, 734 F.2d 1486, 1499 n. 39 (D.C.Cir.) (" 'after full hearing' is similarly not equivalent to the requirement of a decision 'on the record' ") (citation omitted), *cert. denied sub nom. Williams Pipe Line Co. v. Farmers Union Central Exchange, Inc.*, — U.S. —, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984).

■ In addition to its reliance on the statutory language, RCT argues that the ICC action here was adjudicatory in nature and that that adjudicatory nature should inform our reading of the statute's language.[5] However, even assuming *arguen-*

---

5. RCT insists that it is being decertified as a regulator of intrastate railroad commerce. That is not, on analysis, an accurate characterization. Any loss of regulatory power by RCT is directly due to the Staggers Act. The Act provides that States may only regulate intrastate rail transportation if they do so in accordance with the Act; if they submit to the ICC the standards and procedures to be used in exercising their jurisdiction within 120 days of the effective date of the Act; and if the ICC determines that the standards and procedures are in accordance with ICC standards and procedures. The ICC was to act within 90 days of submission and to deny certification to States whose standards and procedures were not in accordance with ICC standards. A State which was either denied certification or did not seek certification in the first place could not exercise any jurisdiction over intrastate rail transport rates, classifica-

tions, rules and practices, until such times that the State received certification. *See* 49 U.S.C. §§ 11501(a)(2), (3), (4).

As we have seen, most States, including Texas, sought certification within the prescribed period of 120 days. However, the ICC found the submissions wanting and thus did not certify any State within the 90 days afforded the Commission by the statute within which to respond. At that point, the ICC seemingly could have denied any State the prerogative of regulating intrastate rail traffic. Instead, the ICC granted provisional certification to the applicant States to permit them to exercise jurisdiction while curing the defects in their certification applications. It was this provisional certification that allowed Texas to exercise jurisdiction until a final decision could be made regarding its certification. Texas has now been denied certification. While the ICC might have decided to extend interim

*do* that the action was adjudicatory in nature, the APA adjudication section, 5 U.S.C. § 554, only applies in cases of adjudication "required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a). As we have seen, the operative statute simply does not require a hearing "on the record." Congress has thus not seen fit to require a formal adjudication subject to 5 U.S.C. §§ 556, 557. "[D]epending upon the nature of the case and the issues requiring resolution, the [agency] has substantial flexibility to structure the hearings it must provide." *Sea-Land Service, Inc. v. United States,* 683 F.2d 491, 495 (D.C.Cir.1982) (citing *United States Lines v. FMC,* 584 F.2d 519, 537 (D.C.Cir.1978) ). *See also Independent U.S. Tanker Owners Committee v. Lewis,*

690 F.2d 908, 922 n. 63 (D.C.Cir.1982) ("The adjudication is informal because no requirement of a hearing 'on the record' is to be found in the Maritime Act nor reasonably inferred from its legislative history.").

While the Staggers Act itself does not trigger the formal hearing requirements of the APA, the ICC nonetheless "must conduct whatever proceedings are necessary to ensure that it has sufficient information so that its final decision reflects a consideration of the relevant factors.... An evidentiary hearing must be conducted when there are disputed issues of material fact." *Sea-Land Service, Inc. v. United States, supra,* 683 F.2d at 496 (citations omitted). The Railroad Commission maintains that a certification deci-

---

certification, not doing so did not constitute a decertification but was rather the natural death of an interim device when the interim period expired. *See supra* note 4.

This general procedure has withstood legal challenge. This court has held the certification procedures of the Staggers Act to be constitutional. *See Illinois Commerce Comm'n v. Interstate Commerce Comm'n,* 749 F.2d 875 (D.C.Cir. 1984), *petition for cert. filed,* 53 U.S.L.W. 3854 (U.S. June 4, 1985) (No. 84–1829). *See also Texas v. United States,* 730 F.2d 339 (5th Cir.) (holding the Staggers Act certification procedures constitutional), *cert. denied,* — U.S. —, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). Furthermore, the Second Circuit has recognized that where temporary authority, in another ICC regulatory scheme, existed pursuant to an application for permanent authority, denial of the application for permanent authority was good cause for the withdrawal of the temporary authority. *See REA Express, Inc. v. United States,* 568 F.2d 940, 953 (2d Cir.1977) ("Temporary authority can exist only pursuant to a pending application for permanent authority. Accordingly, the Commission's dismissal of the ... application for permanent authority constituted 'good cause' under [5 U.S.C. § 210a(a) (1970) ] for revocation of ... temporary authority."), *cert. denied,* 435 U.S. 923, 98 S.Ct. 1486, 55 L.Ed.2d 516 (1978). The section at issue in *REA Express* required such a showing of good cause.

While the ICC has extended interim certification in the past, its decision not to do so here may have been prompted by a 1983 decision of the Seventh Circuit. In *Illinois Central Gulf Railroad Co. v. Interstate Commerce Comm'n,* 720 F.2d 958 (7th Cir.1983), our sister circuit stated:

The conditional certification scheme was implemented as a temporary, emergency measure to maintain the status quo until the ICC

could acquire more information, and thus avoid a confusing and disruptive hiatus in state regulation. As such, it was a valid exercise of the ICC's discretionary power .... Over two years later, however, conditional certification may no longer be justified; it would seem that this period of time would be adequate for the various state regulatory bodies to provide the ICC with information sufficient to make a decision to grant or deny certification, and for the ICC to process that information and make such a decision.

*Id.* at 962–63. The ICC was thus constrained to begin making decisions. In reaching its decision on *Texas,* the Commission refused to certify. That decision would, under the Seventh Circuit's view, seem to require the termination or expiration of RCT's provisional certification.

RCT might find support against this view and in support of its position that it had been decertified in *Utah Power & Light Co. v. Interstate Commerce Comm'n,* 747 F.2d 721 (D.C.Cir. 1984). There, this court stated that "provisional certification is still a certification," *id.* at 726, a statement which would, standing alone, suggest that RCT enjoyed a certification that has been revoked. However, *Utah Power* should not be so read in the entirely disparate setting before us. Unlike the case at hand, *Utah Power* involved the efficacy of a regulation adopted by a State that was provisionally certified. Since the State was so certified, its regulations were determined to have legal effect. The case cannot be read to make provisional certification anything more than provisional. When certification was denied, the provisional certification lapsed. RCT was not decertified of its provisional certification; Texas was, rather, denied certification.

sion rests on a determination of the intent and ability of the State to regulate intrastate rail traffic in accordance with federal standards and procedures and that the Railroad Commission's intent and ability are disputed factual issues in this case. Upon analysis, we cannot agree with Texas' characterization of the issues resolved in the agency proceeding.

As we have seen, States that desired to regulate intrastate rail traffic were required by the Staggers Act to submit their proposed standards and procedures to the ICC for a determination whether those standards and procedures were in accordance with those applied by the Commission. Such a determination is clearly one of law. If a State's submission contained standards and procedures at odds with those of the ICC, the determination that this was the case is obviously legal, not factual, in nature. The more difficult issue concerns state standards and procedures facially conforming to those enunciated by the Commission; but even here a determination that a lack of accord exists rests on legal grounds. If a State consistently interprets its seemingly complying regulations in a fashion that conflicts with the interpretation accorded by the ICC to its own regulations, then the State's standards and procedures are not in accord. While the texts of the two sets of regulations may even be identical, the regulations, *as interpreted,* differ. A determination that a State will continue to interpret its regulations in a contrary manner seems to us no more a factual determination than any other determination that the law of one jurisdiction conflicts with that of another and that prior interpretations will likely remain in effect.

To be sure, there is one other way in which an ICC determination of good faith *vel non* was relevant to the proceedings in question. The Railroad Commission had been given several opportunities to bring its standards and procedures in line with federal requirements. The Railroad Commission had not done so, and the ICC questioned the former's good faith in attempting to do so. *See supra* note 2. If the

decision not to certify had been based on this lack of good faith, then that determination might be viewed as resting on the resolution of a question of fact. However, the ICC's refusal to certify Texas was justified solely on the basis of the latter's failure to comply with ICC standards and procedures. The perceived lack of good faith spoke more clearly to future willingness to bring state standards and procedures into concordance with federal requirements. Lack of good faith does not speak to the denial of certification but rather to the non-extension of the provisional certification which had terminated as a purely legal result of the denial of final certification, *see supra* notes 4, 5; since the denial is justified on non-factual grounds, no factual issues existed so as arguably to warrant a formal hearing.

### B

The Railroad Commission also argues that, regardless of whether it was due a formal hearing, the ICC impermissibly strayed outside the record for its rationale in denying certification. The ICC did in fact ground a portion of its reasoning on RCT actions reviewed in other proceedings before the ICC and in various courts. But no legal error resulted from this extra-record analysis. "[A]s long as all parties in the case at bar were also parties to the other proceedings, the consideration of evidence adduced in the other proceeding cannot be prejudicial and is entirely lawful." *Trailways, Inc. v. Interstate Commerce Comm'n,* 673 F.2d 514, 524 (D.C.Cir.) (citing *United States v. Pierce Auto Freight Lines, Inc.,* 327 U.S. 515, 528–30, 66 S.Ct. 687, 694–95, 90 L.Ed. 821 (1946)), *cert. denied sub nom. Greyhound Lines, Inc. v. Trailways, Inc.,* 459 U.S. 983, 103 S.Ct. 320, 74 L.Ed.2d 296 (1982). The acceptance of evidence adduced at other hearings and in other actions between the same parties should apply *a fortiori* to simple notice of the existence, positions and outcome of the parties in prior hearings and litigation. Furthermore, only the positions taken by RCT with respect to its interpretations of

its standards and regulations had any bearing on the certification decision. Since the submission was part of the record, the ICC must necessarily look to the RCT's own interpretation of its submission. Any evidence as to bad faith, also drawn from the perusal of other proceedings, did not bear on the certification decision but only on the issue of non-extension, and that non-extension was justified by current, rather than future, failure to regulate in accordance with federal law, *see infra* Section III.

### C

RCT's next procedural argument is that inadequate notice was afforded of the potential punitive action to be taken against it. This argument again relies on the characterization of the ICC's action as a decertification, a characterization which we find untenable for reasons already stated. But even under such a characterization, the argument is weak. When properly characterized as a decision not to certify, the argument carries no weight. Once again, we return to the bedrock fact that, under the Staggers Act, Texas had to apply for certification if it was to regulate intrastate rail transportation. Texas timely applied; clearly, one possible outcome of a certification proceeding is a decision by the ICC not to certify the applicant-state authority. From the procedural setting alone, RCT was on notice that it might not be certified.

In short, the Railroad Commission clearly had notice that Texas might not be certified. The loss of temporary certification was the legal outgrowth of the denial of certification, and notice of that obvious potential development flowing from non-certification is simply not required. RCT may argue that it could reasonably expect an extension of its temporary certification and that a decision not to extend could only be made on proper notice, but Texas did in fact have actual notice of non-extension through the numerous warnings set forth in the various ICC decisions. *See supra* note 2.

### D

The final procedural question raised by the Railroad Commission is the propriety of the ICC's use of notational voting. Notational voting is a management device whereby the several members of a multi-member agency or commission vote individually and separately, as opposed to a vote taken at a meeting of the members of the agency. RCT contends that the employment of this procedure worked a violation of the Government in the Sunshine Act, 5 U.S.C. § 552b (1982). We cannot agree. The Sunshine Act does not require that meetings be held in order to conduct agency business; rather, that statute requires only that, if meetings are held, they be open to the public (subject to various enumerated exceptions not relevant here). *See Common Cause v. Nuclear Regulatory Comm'n,* 674 F.2d 921, 935 n. 42 (D.C.Cir.1982) ("The Sunshine Act does not ... prevent agencies from making decisions by sequential, notational voting rather than by gathering at a meeting for deliberation and decision.") (citation omitted); *Pacific Legal Foundation v. Council on Environmental Quality,* 636 F.2d 1259, 1266 (D.C.Cir.1980) ("The Sunshine Act does not require an agency to hold meetings in order to function.... Congress intended to permit agencies to consider and act on agency business by circulating written proposals for sequential approval by individual agency members without formal meetings.") (citations omitted). While our decision in *Communications Systems, Inc. v. Federal Communications Comm'n,* 595 F.2d 797 (D.C.Cir.1978), does state that "[n]otational voting enables Government agencies to expedite consideration of less controversial cases without formal meetings and following the other strictures of the Act," *id.* at 800–01, that case by no means limits the applicability of notational, sequential voting to non-controversial cases, as RCT would have it.

But even accepting Texas' argument in this respect and assuming *arguendo* that the ICC's procedures ran afoul of the Sunshine Act's strictures, the decision to deny

certification would nonetheless not be vulnerable to attack:

> [F]ailure to comply with the Sunshine Act ... provides no basis for us to set aside the agency's action. Section 552b(h)(2), while it does not forbid us to vacate [an] order, strongly indicates a congressional policy that release of transcripts, not invalidation of the agency's substantive action, shall be the normal remedy for Sunshine Act violations.

*Pan American World Airways, Inc. v. Civil Aeronautics Board*, 684 F.2d 31, 36 (D.C.Cir.1982) (footnote omitted). The court in *Pan Am* did observe, in reviewing the legislative history of the Sunshine Act, that circumstances might exist in which agency action should possibly be set aside for such a violation—where the violation was intentional, prejudicial and of a serious nature, *see id.* at 36 (citing H.R.Rep. No. 1441, 94th Cong., 2d Sess. 23 (1976)). However, while the outcome of the ICC's voting in the proceeding at hand is plainly serious for RCT, it is difficult to see how the failure to take that vote in an open meeting worked any prejudice to the Railroad Commission.

## III

In addition to its several procedural challenges, RCT maintains that the ICC's decision denying final certification and not extending RCT's provisional certification was arbitrary and capricious. We find this contention unavailing. The Commission went to considerable lengths to explain its decision. *See* Ex Parte No. 388 (Sub-No. 31), *State Intrastate Rail Rate Authority—Texas* 8–21, served Apr. 20, 1984 ("Sub-No. 31"). Among the problems enumerated by the ICC were several specifically mentioned as being problems in the Railroad Commission's application in Ex Parte No. 388, *State Intrastate Rail Rate Authority.—P.L. 96–448* 7–8, served Feb.

8, 1982 ("Ex Parte No. 388"). Those problems with the State's submission included provisions (1) for the RCT to suspend rates on its own motion; (2) a claim by the Railroad Commission to have jurisdiction coextensive with that of the ICC; (3) excessive RCT-imposed requirements for the disclosure of contract rates; and (4) procedural provisions and restrictions on refiling laid down by the Railroad Commission which were not in accordance with federal law.[6] *See id.* When given the opportunity to correct those problems under interim certification, the Railroad Commission failed to do so. Instead, the Commission found, the RCT "submitted revised standards and procedures that generally fail[ed] to cure the problems, accompanied by argument that it should not have to make any changes." Sub-No. 31 at 8.

With respect to allowing suspension of rates on its own motion rather than only on the motion of an affected party, the ICC observed that Texas had eliminated mention of that practice in its subsequent submissions and now provided only for investigation on its own motion. However, the Commission also took cognizance of a continued argument by the Railroad Commission that such suspensions were proper and an indication that Texas would consider itself a party for the purpose of moving for suspension. Thus, while no longer explicitly providing for suspension on its own motion, RCT did not state that such suspension was not permitted; what is more, the Railroad Commission appeared to interpret "party" so as to grant itself implicit authority to suspend on its own motion. *See id.* at 8–9.

In response to the ICC's finding of fault with RCT's earlier, expansive claim to jurisdiction coextensive with that of the ICC, RCT disclaimed jurisdiction in areas where it was statutorily prohibited from exercising such jurisdiction. The ICC concluded

---

**6.** The Railroad Commission argues that its earlier submission was singled out as exemplary in Ex Parte No. 388; however, it is clear in that decision that it was only the format of the Texas submission that attracted the Commission's praise. When it went beyond packaging and

came to substance, the Commission stated forebodingly that "[u]nfortunately, the Texas submission contains certain elements that are inconsistent with Federal law.... We caution the States not to copy the Texas submission...." *Id.* at 7–8.

from the wording of the disclaimer that "Texas does not acknowledge the implicit limitation on its jurisdiction resulting from our decisions in rulemaking and adjudicatory proceedings." *Id.* at 9. States, if they are to regulate, must of course regulate in accordance with federal standards and procedures. *See* 49 U.S.C. §§ 11501(b), (c). Those standards and procedures "encompass standards and procedures promulgated and interpreted by decisions of the ICC." *Wheeling-Pittsburgh Steel Corp. v. Interstate Commerce Comm'n,* 723 F.2d 346, 354 (3d Cir.1983); *see also Illinois Central Gulf R.R. Co. v. Interstate Commerce Comm'n,* 702 F.2d 111, 115 (7th Cir.1983) ("[C]onsistent rulings of the ICC must necessarily be incorporated and adhered to by state commissions exercising jurisdiction pursuant to the Staggers Act."). Texas' continued claim of coextensive jurisdiction, limited only by the inadequate disclaimer, was reasonably interpreted by the ICC as an indication that Texas would not regulate in accordance with federal law.

The ICC continued to be dissatisfied with RCT's handling of contract rate filings. The major fault divined by the ICC lay in the Railroad Commission's requirement that railroads disclose certain contract terms in filing their tariffs in Austin. The ICC read RCT's revised submission as still requiring the disclosure of terms not required to be disclosed under ICC standards and procedures. *See* Sub-No. 31 at 10–11. The ICC also remained dissatisfied with RCT's rules allowing waiver of a hearing by the default of a respondent railroad and the effect that such a waiver would have on the requirement, under federal standards and procedures, that a complainant or protestant shipper show market dominance. *Id.* at 11–12. Furthermore, the Railroad Commission refused to drop its prohibition on refiling rates found unreasonable upon the default of a respondent railroad. The prohibition was changed from ninety days to sixty days, but "[a]t the Federal level, there is a longstanding policy to permit carriers to change rates

without any required delay period." *Id.* at 12.

Stopping here with these five problem areas would alone be sufficient to demonstrate that the ICC's denial of certification to Texas was neither arbitrary nor capricious. This is particularly so where those problems had been brought to the attention of the Railroad Commission in response to earlier submissions, and RCT had failed adequately to address them. That failure, and the arguments offered and approach to the changes that were made, provided an adequate basis for the ICC to conclude that Texas would not regulate in accordance with federal standards and procedures. That conclusion is buttressed by the ICC's consideration and discussion of some nineteen additional problems with RCT's standards and procedures. *See id.* at 12–21.

Undeterred by all this, RCT now attempts to characterize the ICC's explanation of its denial of certification as mere rationalization. Texas asserts that "the ICC went on a 'defect' hunt in order to bolster a preconceived decision for decertification." Petitioner's Brief at 25. The Railroad Commission's theory appears to be that the ICC's decision was retaliatory in nature, a punitive dismemberment of a careful state regulatory regime carried out by Washington bureaucrats intent on slapping Texas for its insistence upon standing firm on its interpretation of the Staggers Act and regularly appealing the Commission's adverse rulings. RCT does not merely assert that the ICC took into account the unwillingness of Texas to follow Commission precedent in evaluating whether or not Texas would regulate in accordance with federal standards and procedures—a determination the Commission was required to make and to which RCT's past decisions provided probative evidence of the state authority's view of the law. Instead, what RCT appears to assert is that Texas' legal position provided the motive, rather than the evidence, for an arbitrary and capricious exercise of the ICC's authority. That claim will not stand up to examination.

RCT argues that the treatment of certification applications from other States provides evidence that the ICC's decision was retaliatory in nature. Petitioner argues that "[i]n the plans of 20 other States, the ICC found defects of similar nature and similar magnitude.... Yet, in every other case, the ICC either granted certification or extended provisional certification so that modifications could be made. Only in the case of the RCT was certification refused." Petitioner's Brief at 26–27 (footnote omitted).[7] This differing treatment of what RCT views as similarly situated parties also provides, in the Railroad Commission's thinking, an independent basis for finding arbitrary and capricious action. However, an examination of the decisions RCT cites in support of its claim shows that the fourteen States involved were not in fact similarly situated and that the defects in their various submissions were not similar in nature and magnitude to those of the Railroad Commission. We now turn to the specific examples cited by Texas as demonstrating the ICC's engaging in decision-making with an unequal hand.

In Ex Parte No. 388 (Sub-No. 6), *Intrastate Rail Rate Authority—Idaho*, served July 11, 1984, the ICC found certain defects in Idaho's submission. However, the defects related to a lack of detail with regard to certain provisions. The Commission repeatedly noted that Idaho's standards and procedures indicated that the State deemed itself bound by the Staggers Act and, where appropriate, by ICC regulations. The ICC indicated, however, that the provisions of Idaho's submission should be more specific, should embody more formal procedures, and that incorporation by reference of ICC regulations should be re-

placed by the adoption of specific state rules. The ICC found that Idaho was demonstrating good faith in coming into compliance, a position which, in stark contrast to the situation in Texas, was fully supported by Idaho railroads. Since no·protest petitions had been filed against Idaho, the Commission, while noting the general concern over provisional certification expressed in *Illinois Central Gulf R.R. Co. v. Interstate Commerce Comm'n*, 720 F.2d 958 (7th Cir.1983), determined that Idaho was currently regulating in accordance with federal law and accordingly extended Idaho's provisional certification.

Indiana likewise had its interim certification extended in 1984. The ICC examined the State's submissions and found that the standards and procedures therein "demonstrate[d] a thorough and good faith effort to comply with Federal law." Ex Parte No. 388 (Sub-No. 8), *Intrastate Rail Rate Authority—Indiana* 1, served June 19, 1984. Again there were calls from Washington for greater specificity in the submissions, a requirement that several rules be changed and that several changes in ICC regulations be incorporated in the Indiana rules. Since Indiana had no recently granted petitions, the Commission determined that the State was regulating in accordance with federal law and extended its provisional certification.

In Ex Parte No. 388 (Sub-Nos. 5, 9, 13, 17, 22), *Intrastate Rail Rate Authority—Georgia, Iowa, Maryland, Missouri, New Mexico*, served May 23, 1984, the Commission again found a good-faith effort on the part of the five States involved. None of the five had petitions filed against them;

---

7. RCT cites only Ex Parte No. 388 (Sub-No. 6), *Intrastate Rail Rate Authority—Idaho*, served July 11, 1984; Ex Parte No. 388 (Sub-No. 8), *Intrastate Rail Rate Authority—Indiana*, served June 19, 1984; Ex Parte No. 388 (Sub-Nos. 5, 9, 13, 17, 22), *Intrastate Rail Rate Authority—Georgia, Iowa, Maryland, Missouri, New Mexico*, served May 23, 1984; Ex Parte No. 388 (Sub-No. 18), *Intrastate Rail Rate Authority—Montana*, served May 23, 1984; Ex Parte No. 388 (Sub-No. 24), *Intrastate Rail Rate Authority—North Dakota*, served Nov. 7, 1983; Ex Parte No. 388 (Sub-No. 25), *Intrastate Rail Rate Authority—Ohio*, served Oct. 21, 1983; Ex Parte No. 388 (Sub-No. 3, 27), *Intrastate Rail Rate Authority—Colorado, Oregon*, served May 19, 1983; Ex Parte No. 388 (Sub-No. 7), *Intrastate Rail Rate Authority—Illinois*, served May 4, 1983. *See* Petitioner's Brief at 26 n. 3. RCT also discusses, without citing, the ICC Alabama decision, presumably Ex Parte No. 388 (Sub-No. 1), *Intrastate Rail Rate Authority—Alabama*, served Aug. 1, 1984. *See* Petitioner's Brief at 26–27.

moreover, they appeared to be faithfully applying their provisionally certified standards in compliance with federal law. The ICC required that certain statements be added or clarified in several submissions and pointed out only "editorial errors" in others. All five States had their provisional certifications extended.

Montana too was found to be making a good-faith effort at compliance. Again, certain additional or more specific rules were required, and it was ordered that interim ICC regulations incorporated in the Montana submission be changed to incorporate the ICC's final rules. Here too, the Commission found in the fact that no petitions had been filed against Montana an indication that the State was regulating in accordance with federal law and accordingly extended Montana's provisional certification. *See* Ex Parte No. 388 (Sub-No. 18), *Intrastate Rail Rate Authority—Montana,* served May 23, 1984.

Much the same may be said of the decision with regard to North Dakota in Ex Parte No. 388 (Sub-No. 24), *Intrastate Rail Rate Authority—North Dakota,* served Nov. 7, 1983. While offering general praise for the State's submission, the ICC pointed to some lack of specificity, a need for modifications and an inconsistency with federal law (and perhaps with the State's own rules). The ICC extended North Dakota's provisional certification and did so without an explicit statement that the State was acting in good faith or a look to petition filings to determine whether the State was currently regulating in accordance with federal law. However, the decision in this proceeding was served the day before the decision in *Illinois Central Gulf R.R. Co. v. Interstate Commerce Comm'n, supra,* and the ICC accordingly had no occasion to explain why it was extending provisional certification despite the views expressed in that subsequently issued opinion. Even if North Dakota's submission had suffered from precisely the infirmities of the Texas submission, a difference in treatment would be justified by the Seventh Circuit's intervening questioning of the legitimacy of continuing provisional

certification. *See id.* at 962–63 ("The conditional certification scheme was implemented as a temporary, emergency measure.... As such, it was a valid exercise of the ICC's discretionary power.... Over two years later, however, conditional certification may no longer be justified.... As the situation exists now, many States are regulating intrastate rail carriage without having established that they are doing so in conformity with federal standards."). The pre-*Illinois Central* decisions in Ex Parte No. 388 (Sub-No. 25), *Intrastate Rail Rate Authority—Ohio,* served Oct. 21, 1983; Ex Parte No. 388 (Sub-Nos. 3, 27), *Intrastate Rail Rate Authority—Colorado, Oregon,* served May 19, 1983; and Ex Parte No. 388 (Sub-No. 7), *Intrastate Rail Rate Authority—Illinois,* served Mar. 4, 1983, are similarly irrelevant.

Alabama is the only other State to which the Railroad Commission specifically refers as being disparately treated despite having submitted a plan with defects similar in nature and magnitude to those in the Texas submission. It is in the Alabama decision, Ex Parte No. 388 (Sub-No. 1), *Intrastate Rail Rate Authority—Alabama,* served Aug. 1, 1984, that RCT can find the closest counterpart to Texas' situation. Alabama, like Texas, maintained that it was bound only by federal statutes, not by ICC rulemaking and adjudicatory decisions. *See id.* at 2. The ICC stated that this was error and required Alabama to revise its submission accordingly; tellingly, in Texas' view, the ICC elected to extend the State's provisional certification. However, once again, the Commission pointed out that no petitions had been filed challenging Alabama's regulations. The ICC interpreted the stony silence in the regulated community as a probative indication that Alabama, despite its disagreement with the ICC, was regulating in conformity with federal standards and would continue to do so while modifying its standards.

By comparison, with regard to Texas, the ICC stated that "there is a quantum difference between the resistance we have encountered in attempting to deal with the

RCT and the differences we have had with other States over the interpretation and implementation of the Staggers Act." Ex Parte No. 388 (Sub-No. 31), *Intrastate Rail Rate Authority—Texas* 1, served Apr. 20, 1984. The Commission then went on to lay out the problems, discussed *supra,* with the Railroad Commission. If we had only this ICC characterization of Texas' intransigence in comparison to findings of good faith on the parts of other States, we might be constrained to examine even more closely Texas' claim that the ICC was motivated by its disaffection for the RCT's gusto for litigating its view of the Staggers Act. However, the relative scarcity of petitions for review of the decisions of other States, in marked contrast to the long history of petitions by railroads from RCT decisions, *see supra* note 1, provides independent evidence of the "quantum difference" between Texas and the other States. While the other States' rules may not have been perfected, the ICC could reasonably respond to the *Illinois Central* concerns over regulation by States that had not demonstrated conformity with federal standards by noting that those States were regulating in accordance with federal law even though they had not yet been certified. The ICC could not legitimately make such an exculpatory claim with respect to Texas.

We therefore conclude that the decisions of the ICC to deny certification to Texas and not to extend the State's provisional certification were not arbitrary and capricious. The Commission set forth a reasoned explanation for its action; since Texas presented a *sui generis* situation, the ICC decision cannot be faulted for any purported failure to conform to its decisions with regard to other States. The petition to review is, for the reasons stated,

*Denied.*