879 F.2d 917
 279 U.S.App.D.C. 71, 58 USLW 2079
 ILLINOIS COMMERCE COMMISSION, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Chicago and North Western Transportation Co., Illinois
Department of Transportation, National Association
of Regulatory Utility Commissioners,
Association of American
Railroads, Intervenors.
 No. 87-1088.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 31, 1988.
Decided July 18, 1989.
Rehearing and Rehearing En Banc Denied Oct. 12, 1989.
 
 Gordon P. MacDougall, Washington, D.C., and James E. Weging, Illinois Special Asst. Atty. Gen., Chicago, Ill., with whom Walter J. Binder, Jr., Cary, Ill., was on the brief for petitioners.
 
 
 1
 Evelyn G. Kitay, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, and Ellen D. Hanson, Associate Gen. Counsel, I.C.C., Washinton, D.C., were on the brief for respondent I.C.C.
 
 
 2
 James E. Weging, Chicago, Ill., entered an appearance for intervenor Illinois Department of Transportation.
 
 
 3
 Catherine G. O'Sullivan and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondent United States of America.
 
 
 4
 L. John Osborn, with whom Myles L. Tobin, Chicago, Ill., and Fritz R. Kahn, Washington, D.C., were on the brief for intervenor Chicago and North Western Transp. Co.
 
 
 5
 Paul Rodgers and Charles D. Gray, Washington, D.C., were on the brief for intervenor National Association of Regulatory Utility Commissioners.
 
 
 6
 J. Thomas Tidd and John B. Norton were on the brief for intervenor Association of American Railroads.
 
 
 7
 William J. Dwyer was on the brief for amicus curiae New York State Dept. of Transp., urging reversal.
 
 
 8
 Timothy R. Baker was on the brief for amicus curiae Montana Department of Public Service Regulation, Public Service Commission, urging reversal.
 
 
 9
 Merrell M. Peters, Asst. Atty. Gen., State of Iowa, was on the brief for amicus curiae State of Iowa, urging reversal.
 
 
 10
 Daniel D. Stier, Madison, Wis., entered an appearance for amicus curiae Wisconsin Office of Commissioner of Transportation.
 
 
 11
 Before ROBINSON, RUTH B. GINSBURG and SENTELLE, Circuit Judges.
 
 
 12
 Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.
 
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 13
 The Interstate Commerce Act confers upon the Interstate Commerce Commission power to regulate abandonments of railroad lines,[1] but excepts from this grant abandonments of spur tracks located entirely within a single state.[2] At issue here is a Commission decision and order holding that the Act preempts all authority of a state agency over abandonment of spur tracks lying wholly within the state's borders.[3] We reverse.
 
 I. BACKGROUND
 
 14
 Chicago and North Western Transportation Company (C & NW), an interstate rail carrier, decided to abandon a 570-foot strip of track located in the Village of Cary, McHenry County, Illinois. C & NW petitioned the Commission for an exemption from compliance with the Act's provisions governing abandonments of railroad lines.[4] After public notice[5] and comment,[6] the Commission ruled that the trackage was a line of railroad rather than a spur because it was "used as part of the actual transportation movement to and from [the shipper]," and on that account was subject to the agency's jurisdiction.[7] The Commission granted the requested exemption,[8] and denied applications for reconsideration and a stay.[9]
 
 
 15
 The Illinois Commerce Commission and others petitioned the United States Court of Appeals for the Seventh Circuit for review of the Commission's decision to grant the exemption,[10] and there they succeeded in overturning it.[11] While acknowledging that the Commission's conclusion as to whether trackage is spur or line of railroad is entitled to "the greatest deference" because of the agency's expertise,[12] the court declared that the matter was "a 'mixed question of law and fact to be determined judicially rather than administratively.' "[13] After reviewing the record in light of applicable judicial precedents, the court vacated the Commission's finding that the trackage was a line of railroad on the ground that it was "insufficiently supported by reasoned analysis."[14] The court observed that
 
 
 16
 [e]ven accepting the ICC's contention that the use of the track controls, however, we have not been persuaded that the Cary Spur is used as a line of railroad. This case is readily distinguishable from cases finding track to be a line of railroad.[15]
 
 
 17
 Remanding the case for reconsideration, the court noted that the Commission had not addressed "the division of responsibility between the Illinois Commerce Commission and the ICC" in its analysis of whether the trackage was a line of railroad or a spur.[16]
 
 
 18
 On remand, the Commission reversed its original stance and held unanimously the trackage was a spur and thus was not subject to its abandonment jurisdiction.[17] It further held, however, with two commis sioners dissenting, that abandonment of the Cary spur was also outside the domain of state regulatory authority.[18] The Commission took the large body of Supreme Court precedent[19] as assuming, "apparently without argument on the point," residual state jurisdiction over spur abandonments;[20] as allowing state authority to be preempted when there was an "overriding Federal interest in protecting interstate commerce from State-imposed burdens;"[21] and as producing "curious results."[22] Then, combining the Act's definition of "railroad"--which includes "spur track 'used or necessary for transportation' "[23]--with the Act's "broad preemption of all economic regulation of trackage used for the conduct of interstate commerce," the Commission concluded that intrastate spurs fall within its general jurisdiction and outside only its abandonment authority,[24] and that state power to regulate local spurs over which traffic moves in interstate commerce was preempted.[25] The Commission felt that the legislative history of the Act supported this interpretation,[26] and that the Staggers Rail Act of 1980[27] removed any lingering doubt on that score.[28] The Commission reasoned that the Illinois Commerce Commission derives its power to regulate intrastate rail transportation from the Interstate Commerce Act and that the Staggers Rail Act directs state commissions to apply federal standards, with the result that the state agency does not have authority to regulate spur abandonments when the Commission lacks jurisdiction to do so.[29]
 
 
 19
 Petitioners now seek review in this court. The parties accept the Commission's ruling that the trackage in question is a spur. We turn, then, to the parts of the Commission's decision in which the authority of petitioner Illinois Commerce Commission to regulate the abandonment of the spur was held to have been preempted.
 
 II. THE STANDARD OF REVIEW
 
 20
 The Commission argues here that "the statute is silent or ambiguous with respect to this issue," that "the Commission's interpretation is reasonable," and accordingly that "the Commission's interpretation should be upheld."[30]
 
 
 21
 Ordinarily, a court reviewing an agency's construction of a statute which it administers must first ascertain "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter...."[31] If, however, the statute is silent or ambiguous on the particular issue, the court must then determine whether the agency's interpretation is a permissible construction of the statute.[32] The agency's construction must be accepted[33] when it is reasonable,[34] but not if it is contrary to clear congressional intent.[35]
 
 
 22
 There is in this case, however, another important consideration, arising from the Commission's invocation of two separate statutory provisions as independent bases for its holding that state authority was preempted. The Commission's position is that preemption was wrought, not by action of the agency within the scope of its delegated authority, but by force of the federal statutory provisions themselves.[36] In situations of the latter type "[w]here ... the field which Congress is said to have pre-empted has been traditionally occupied by the States, ... 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' "[37] "The critical question in any preemption analysis," then, "is always whether Congress intended that federal regulations supersede state law."[38] Accordingly, "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons--either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."[39]
 
 
 23
 We have recognized that the necessity and propriety of Chevron deference in contests over preemption remain open questions,[40] and we have no occasion to resolve them here. For on each of the two statutory provisions upon which the Commission relies, we find that it fails to meet either set of standards.
 
 III. THE EXCEPTION OF SPUR TRACKS
 
 24
 At the outset, we note that the "Interstate Commerce Act is among the most pervasive and comprehensive of federal regulatory schemes."[41] Yet, while the Commission's authority to regulate abandonments of lines of railroad is exclusive[42] and plenary,[43] the Act, in Section 10907(b)(1), explicitly excludes therefrom "spur, industrial, team, switching, or side tracks if the tracks are located ... entirely in one State."[44]
 
 
 25
 This language plainly excepts abandonments of intrastate railroad spurs from Commission regulation. It does not, however, expressly answer the question whether a state agency has authority to regulate them; it simply provides that the Commission may not. Nonetheless, we think state power to do so follows as inevitably as night follows day. Absent federal control of railroading, the states, as sovereigns, unquestionably would have regulatory power over railroads operating within their respective borders.[45] That power is dislodged to the extent, but only to the extent, that it is preempted for paramount federal purposes.
 
 
 26
 That was the thinking behind the forerunner of Section 10907(b)(1),[46] as reflected by such legislative history as is relevant. During floor debate prior to its enactment in 1920, Representative Esch, chairman of the House Committee on Interstate and Foreign Commerce and sponsor of the House bill, explained that the states would continue to regulate abandonments of such spurs:
 
 
 27
 We provide that there shall be some Federal control over the matter of abandonment, so that cities and villages that have been built up on these lines can be given due consideration by the regulatory body before the order for abandonment is issued. We give such control to the commission to investigate the situation and determine the facts. But neither provision, the building of new lines or the abandonment of old ones, affects spurs or switches or terminal tracks or interurban lines wholly within a State. These we leave to State control, where they already belong.[47]
 
 
 28
 It also has been the uniform view of the many jurists who have encountered the question. In a large and imposing array of decisions, the Supreme Court,[48] this court,[49] and other courts[50] have considered the construction and abandonment of intrastate spurs activities excluded from Commission authority and left to state control.
 
 
 29
 The Commission felt, however, that since spur trackage is included in the statutory definition of "railroad,"[51] intrastate spurs fall within the exclusive jurisdiction of the Commission.[52] "[T]he spur line provision of Sec. 10907(b)" the Commission stated, "does not mean that spurs are outside the Commission's jurisdiction, but that they are exempt from its abandonment oversight."[53] This argument loads the definition with far more weight than it can bear. To be sure, an intrastate spur is part of a railroad but, as Section 10907(b)(1) makes evident, Commission jurisdiction does not extend to that part. Nor can we accept the Commission's attempted differentiation of its "abandonment oversight" and its "jurisdiction." Section 10907(b) specifies in no uncertain terms that the Commission "does not have authority under" Section 10903--the sole grant of Commission regulatory power over abandonments--with respect to intrastate spurs. We simply cannot find jurisdiction where there is a total lack of authority to act.[54] With the Commission lacking jurisdiction over abandonment of intrastate rail spurs, power to regulate them is surely vested in the states.
 
 
 30
 The proscription on Commission regulation of intrastate spur abandonments has remained in force almost continuously since 1920. The only hiatus--a very short one--occurred when the ban was inadvertently omitted from the Railroad Revitalization and Regulatory Reform Act of 1976.[55] The House took the lead in restoring it; the House Committee on Interstate and Foreign Commerce explained:
 
 
 31
 In establishing local rail service continuation in the Railroad Revitalization and Regulatory Reform Act of 1976, amendments to the Interstate Commerce Act were included in the nature of substitute provisions dealing with abandonments of lines of railroads, together with technical conforming amendments to that Act's provisions dealing with extensions. In particular, it added a new section 1a (Discontinuance and Abandonment of Rail Service) to the Interstate Commerce Act. This new section, however, inadvertently does not expressly exempt "spur lines" from its provisions. The Commission's abandonment procedures have never applied to such track and it is not Congress' intent (nor does the Commission desire) that such track should be subject to its abandonment procedures. These tracks are not operated as a part of a general system of rail transportation and thus are purely local and should be subject to local jurisdiction as has been the case historically.[56]
 
 
 32
 The intrastate spur exception was reenacted as a part of the Rail Transportation Improvement Act[57] eight months after it had been accidentally dropped. Save for this short period, the exception has endured for almost seven decades from inception to the present without any change in substance.[58]
 
 
 33
 While Section 10907(b)(1) does not deal expressly with state authority to regulate abandonments of intrastate spur trackage, we are satisfied that it does so by necessary implication. Preservation of that authority was a stated goal at the very outset of legislation concerning such trackage, and a reaffirmed objective as late as 1976. The courts have recognized with remarkable consistency the states' power in this regard, and we are impressed, if indeed not bound, by the Supreme Court and in-circuit precedents. To us it is well-nigh inconceivable that Congress intended to preempt state authority over abandonment of an intrastate spur, as to which the Commission lacks power, leaving it entirely unregulated, the public interest unprotected, and parties affected by the abandonment without recourse. We find the Commission's broad construction of Section 10907(b)(1) unreasonable, and far short of the demonstration of congressional intent required to support preemption of the residual power of the states respecting intrastate spurs. We hold that by virtue of the exception established by Section 10907(b)(1), abandonments of intrastate spurs are beyond the jurisdiction of the Commission, and within the residual regulatory authority of the states.
 
 IV. THE STAGGERS RAIL ACT OF 1980
 
 34
 In the decision under review, the Commission advanced an alternative ground for its conclusion that such abandonments are not wholly within state control. It pointed to Section 11501(b)(2),[59] as amended by the Staggers Rail Act of 1980[60] and asserted that it outlawed all rail regulation by the states.[61]
 
 Section 11501(b)(1) provides that
 
 35
 [a] State authority may only exercise jurisdiction over intrastate transportation provided by a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title if such State authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle.[62]
 
 
 36
 The Commission declared that "the Staggers Rail Act of 1980 preempted State rail regulation altogether;"[63] "[t]he authority of the States enumerated in Sec. 11501 and elsewhere in the Interstate Commerce Act constitute the sole source of State jurisdiction;"[64] and that "States regulating intrastate rail transportation are bound to apply Federal standards."[65]
 
 
 37
 The central concern of the Staggers Rail Act was reformation of the economic regulation of railroads.[66] Section 214 of that legislation, which amended and reenacted Section 11501, is captioned "Intrastate Rates."[67] Everything in Section 11501 that follows subsection (b)(2) is unquestionably referable solely to ratemaking.[68] The mechanism by which consistency between interstate and intrastate ratemaking is maintained is certification,[69] and we are told that in practice certification is limited to ratemaking.[70]
 
 
 38
 More importantly, the legislative history makes very clear that Section 11501(b)(2) addresses intrastate ratemaking and nothing more. As explained by the Conference Committee,
 
 
 39
 [t]he Senate bill amends section 11501 to ... limit the Commission's authority to prescribe a rate or effect other action which is inconsistent with its rate regulatory authority as limited by the act.... The House amendment ... amends section 11501 by adding new provisions which provide that only State authorities whose standards and procedures have been certified by the Commission may exercise jurisdiction over intrastate rail rates, classifications, rules and practices.... The Conference substitute adopts the House amendment, except that the Commission's power to adjust intrastate rates is retained in the event that actions by certified states impose a burden on intrastate commerce. The conferees' intent is to insure that the price and service flexibility and revenue adequacy goals of the Act are not undermined by state regulation of rates, practices, etc., which are not in accordance with these goals. Accordingly, the Act preempts state authority over rail rates, classifications, rules and practices. States may only regulate in these areas if they are certified under the procedures of this section.[71]
 
 
 40
 When, in 1981, the Commission was first confronted by Section 214, it ruled that the provision did not reach beyond intrastate rail ratemaking and associated tariffing.[72] It said:
 
 
 41
 The focus of Section 214 is plainly on federal and State jurisdiction to regulate intrastate rates. The statute repeatedly employs the phrase "intrastate rates, classifications, rules and practices for intrastate transportation," 49 U.S.C. 11501 subsections (b)(2), (b)(3)(B), (b)(4)(A) and (c). (fn.) (In our view the specific words "rates and classifications", terms which apply only to ratemaking, limit the broader words "rules and practices" which follow. Congress' express placement of ratemaking terms at the beginning of the phrase[ ], indicates its intent that the general terms at the end of the phrase are qualified by the term "intrastate rates.") Nowhere does the section mention line abandonments.[73]
 
 
 42
 Three years later, the Commission adhered to that interpretation.[74] In 1986, however, it shifted its position.[75] A railroad sought authority to discontinue service between two points in California, a state not then certified under Section 11501. The Commission, one member dissenting, held that the interstate service-discontinuance procedures applied. Section 11501(b)(1), the Commission asserted, went beyond ratemaking and intercepted all intrastate transportation:
 
 
 43
 [T]he law clearly provides that a State may regulate intrastate transportation only if it follows Federal standards and procedures (section 11501(b)(1)). Certification is the only means by which States can so regulate intrastate transportation; California did not ask to be certified. Accordingly, regulation of California rail transportation matters was preempted by this Commission.
 
 
 44
 In determining the extent of this preemption, we note that section 11501 uses the broad term "intrastate transportation" and draws no distinction between freight and passenger operations conducted by an ICC-regulated "rail carrier." "Transportation by rail carriers," as used in sections 10501 (defining ICC jurisdiction), as well as 11501, includes "movement of passengers, or property, or both." 49 U.S.C. 10102(25)(A). There is no freight/passenger dichotomy in the Staggers Act language nor in the legislative history which would allow us to find that, in the absence of certification, States may continue to regulate passenger service.[76]
 
 
 45
 That view prevailed in the decision under review,[77] as we have noted, and again, with two commissioners dissenting, in a subsequent abandonment proceeding.[78]
 
 
 46
 We agree with the petitioners that the Commission's reliance upon section 11501(b)(2) is misplaced. While that section speaks in terms of state exercises over "intrastate transportation," those words must be read in context, which here is emphatically and exclusively ratemaking and related activities. The legislative history demonstrates that the section was intended to maintain consistency between Federal and state "price and service flexibility and revenue adequacy goals,"[79] rather than trackage abandonment and other noneconomic matters.
 
 
 47
 The Commission's reading of section 11501(b)(2) brings it into collision with section 10907(b)(1). An established rule of statutory construction is that a specific provision--here, section 10907(b)(1)--prevails over a general provision;[80] another canon, equally embedded in our law, counsels an interpretation, whenever possible, reconciling and giving operative effect to all provisions of the statute.[81] Not only did the Commission disregard these wholesome principles, but it flouted the clear intent of Congress in its interpretation of Section 11501(b)(2), and in its endorsement of preemption in a situation in which it fell far short of satisfying the prerequisites thereto. We hold that Section 11501(b)(2) imposes no barrier to state regulation of the abandonment of the Cary spur. The decision and order under review are accordingly reversed, and the case is remanded to the Commission for further proceedings consistent with this opinion.
 
 
 48
 So ordered.
 
 
 
 [1]
 49 U.S.C. Secs. 10903-10906 (1982 & Supp. V 1987)
 
 
 [2]
 "The Commission does not have authority under sections 10901-10906 of this title over ... the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks if the tracks are located, or intended to be located, entirely in one State...." Id. Sec. 10907(b)(1) (1982)
 
 
 [3]
 Chicago & N.W. Transp. Co.--Abandonment Exemption--In McHenry County, Il., 3 I.C.C.2d 366 (1987) [hereinafter Commission Decision ]
 
 
 [4]
 C & NW's petition invoked 49 U.S.C. Sec. 10505(a) (1982 & Supp. V 1987), Joint Appendix (J.App.) 2-7, under which a transaction must be exempted
 when the Commission finds that the application of a provision of this subtitle (1) is not necessary to carry out the transportation policy of Sec. 10101a of this title; and (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.
 If the Act applied to the proposed abandonment and there was no exemption, C & NW would have had to engage in an elaborate proceeding and satisfy numerous requirements, see id. Secs. 10904-10906, and the Commission would have had to find that "the present or future public convenience and necessity require or permit the abandonment" before it could give its approval. Id. Sec. 10903.
 
 
 [5]
 J.App. 17-18
 
 
 [6]
 J.App. 38-39. Comments in opposition to the petition were filed by C. Franke and Company, Inc., the only shipper served by the spur; the Village of Cary; the Railway Labor Executives' Association; the Illinois Department of Transportation; Patrick Simmons, the Illinois Legislative Director of the United Transportation Union; and the Illinois Commerce Commission. J.App. 8-16, 29-37, 41-102, 127-189, 208-211
 
 
 [7]
 Chicago & N.W. Transp. Co.--Abandonment--Exemption in McHenry County, Il., I.C.C. Docket No. 30401 (Sept. 25, 1984) at 2
 
 
 [8]
 Id. at 4
 
 
 [9]
 Chicago & N.W. Transp. Co.--Abandonment--Exemption in McHenry County, Il., I.C.C. Docket No. 30401 (Oct. 29, 1984) (denying petitions for stay), (Jan. 11, 1985) (denying petitions for reconsideration), and (Jan. 14, 1985) (denying supplemental petition for stay)
 
 
 [10]
 The Village of Cary, C. Franke & Company, Inc., and Patrick W. Simmons joined in the proceeding
 
 
 [11]
 Illinois Commerce Comm'n v. United States, 779 F.2d 1270 (7th Cir.1985)
 
 
 [12]
 Id. at 1271
 
 
 [13]
 Id. (quoting New Orleans Terminal Co. v. Spencer, 366 F.2d 160, 164 (5th Cir.1966), cert. denied, 386 U.S. 942, 87 S.Ct. 974, 17 L.Ed.2d 873 (1967))
 
 
 [14]
 Illinois Commerce Comm'n v. United States, supra note 11, 779 F.2d at 1272
 
 
 [15]
 Id. (emphasis in original)
 
 
 [16]
 Id. at 1273
 
 
 [17]
 Commission Decision, supra note 3, 3 I.C.C.2d at 367-368
 
 
 [18]
 Id. at 368-372
 
 
 [19]
 See note 48 infra
 
 
 [20]
 Commission Decision, supra note 3, at 368-369
 
 
 [21]
 Id. at 369
 
 
 [22]
 Id. at 370
 
 
 [23]
 See 49 U.S.C. Sec. 10102(21) (1982 & Supp. V 1987)
 
 
 [24]
 Commission Decision, supra note 3, 3 I.C.C.2d at 369
 
 
 [25]
 Id. at 369-372
 
 
 [26]
 Id. at 369-370
 
 
 [27]
 Pub.L. No. 96-448, 94 Stat. 1895 (codified in scattered sections of 49 U.S.C.)
 
 
 [28]
 Commission Decision, supra note 3, 3 I.C.C.2d at 371
 
 
 [29]
 Id. at 371-372
 
 
 [30]
 Brief for Respondent at 17
 
 
 [31]
 Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694, 702-703 (1984). See also NLRB v. United Food & Commercial Workers Union, 484 U.S. 112, ----, 108 S.Ct. 413, 421, 98 L.Ed.2d 429, 441 (1987); INS v. Cardoza-Fonseca, 480 U.S. 421, 446-448 & n. 29, 107 S.Ct. 1207, 1220-1221 & n. 29, 94 L.Ed.2d 434, 457-458 & n. 29 (1987)
 
 
 [32]
 Chevron U.S.A., Inc. v. NRDC, supra note 31, 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at 703. Accord, NLRB v. United Food & Commercial Workers Union, supra note 31, 484 U.S. at ----, 108 S.Ct. at 421, 98 L.Ed.2d at 442; INS v. Cardoza-Fonseca, supra note 31, 480 U.S. at 445 n. 29, 107 S.Ct. at 1220 n. 29, 94 L.Ed.2d at 456 n. 29; Clark-Cowlitz Joint Operating Agency v. FERC, 264 U.S.App.D.C. 58, 70, 826 F.2d 1074, 1086 (1987), cert. denied, --- U.S. ----, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988)
 
 
 [33]
 Chevron U.S.A., Inc. v. NRDC, supra note 31, 467 U.S. at 844-845, 104 S.Ct. at 2782, 81 L.Ed.2d at 703 (citations omitted)
 
 
 [34]
 Id. at 844-845, 104 S.Ct. at 2782-2783, 81 L.Ed.2d at 704 (quoting United States v. Shimer, 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908, 914, 915 (1961)) (citations omitted); Clark-Cowlitz Joint Operating Agency v. FERC, supra note 32, 264 U.S.App.D.C. at 69 n. 11, 826 F.2d at 1085 n. 11
 
 
 [35]
 Chevron U.S.A., Inc. v. NRDC, supra note 31, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9, 81 L.Ed.2d at 703 n. 9 (citations omitted); Clark-Cowlitz Joint Operating Agency v. FERC, supra note 32, 264 U.S.App.D.C. at 73, 826 F.2d at 1089 (examining legislative history for " 'compelling indications' of the sort necessary to overturn an agency's reading that is in harmony with the express language of the legislation")
 
 
 [36]
 See City of New York v. FCC, 486 U.S. 57, ----, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48, 57 (1988)
 
 
 [37]
 Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 614 (1977) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947) (citations omitted))
 
 
 [38]
 Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369, 382 (1986) (citation omitted)
 
 
 [39]
 Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, 257 (1963). See also Hayfield N.R. Co. v. Chicago & N.W. Transp. Co., 467 U.S. 622, 632, 104 S.Ct. 2610, 2616, 81 L.Ed.2d 527, 536 (1984); Commonwealth Edison Co. v. Montana, 453 U.S. 609, 634, 101 S.Ct. 2946, 2962, 69 L.Ed.2d 884, 905 (1981); Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402, 416 (1981)
 
 
 [40]
 City of New York v. FCC, 259 U.S.App.D.C. 191, 197, 814 F.2d 720, 726 (1987), aff'd, 486 U.S. 57, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988)
 
 
 [41]
 Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 318, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258, 265 (1981)
 
 
 [42]
 Id. at 320, 101 S.Ct. at 1131, 67 L.Ed.2d at 265 (citing Alabama Pub. Serv. Comm'n v. Southern Ry., 341 U.S. 341, 346 n. 7, 71 S.Ct. 762, 766 n. 7, 95 L.Ed. 1002, 1007 n. 7 (1951), and, in turn citing Colorado v. United States, 271 U.S. 153, 164-166, 46 S.Ct. 452, 454-455, 70 L.Ed. 878, 883-884 (1926))
 
 
 [43]
 Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., supra note 41, 450 U.S. at 320, 101 S.Ct. at 1131-1132, 67 L.Ed.2d at 267 (citing Palmer v. Massachusetts, 308 U.S. 79, 85, 60 S.Ct. 34, 37, 84 L.Ed. 93, 98 (1939))
 
 
 [44]
 49 U.S.C. Sec. 10907(b)(1) (1982), quoted more fully supra note 2
 
 
 [45]
 See, e.g., Palmer v. Massachusetts, supra note 43, 308 U.S. at 84-85, 60 S.Ct. at 37, 84 L.Ed. at 98; Western & A.R.R. v. Georgia Pub. Serv. Comm'n, 267 U.S. 493, 496, 45 S.Ct. 409, 410, 69 L.Ed. 753, 756 (1925)
 
 
 [46]
 Transportation Act of 1920, Pub.L. No. 66-152, Sec. 402, 41 Stat. 456, 478 providing that "[t]he authority of the Commission conferred by paragraphs [of this Act regulating lines of railroad] shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one State...."
 
 
 [47]
 58 Cong.Rec. 8316 (1919). The Commission points to contrary assertions by Senators Robinson and Cummins, both of whom were displeased by the proposed legislation. It is well settled that statements by opponents of legislation are entitled to little weight. National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 639, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357, 375 (1967) (" 'we have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents' ") (quoting NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760, 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129, 135 (1964)); Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 288, 76 S.Ct. 349, 361, 100 L.Ed. 309, 323 (1956) ("[a]n unsuccessful minority cannot put words into the mouths of the majority and thus, indirectly, amend a bill"); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394-395, 71 S.Ct. 745, 750, 95 L.Ed. 1035, 1048 (1951) ("[t]he fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt")
 
 
 [48]
 Yonkers v. United States, 320 U.S. 685, 690, 64 S.Ct. 327, 330, 88 L.Ed. 400, 403 (1944) ("[u]nderlying Sec. [10907(b) ] is a Congressional policy of reserving exclusively to the States control over that group of essentially local activities"); Palmer v. Massachusetts, supra note 43, 308 U.S. at 84-85, 60 S.Ct. at 37, 84 L.Ed. at 98 (Supreme Court "has disfavored inroads by implication on state authority and resolutely confined restrictions upon the traditional power of states to regulate their local transportation to the plain mandate of Congress.... The dependence of local communities on local railroad services has for decades placed control over their curtailment within the regulatory authorities of the states"); United States v. Idaho, 298 U.S. 105, 110, 56 S.Ct. 690, 692, 80 L.Ed. 1070, 1075 (1936) ("if ... branch should be held to be a spur, it could not be abandoned legally without the consent of the Public Utilities Commission of Idaho"); ICC v. Oregon-Washington R.R. & Navigation Co., 288 U.S. 14, 40, 53 S.Ct. 266, 274, 77 L.Ed. 588, 604 (1933) ("[t]he Act, reasonably construed, distinguishes between ... extensions, voluntarily undertaken ...; compulsory extensions ...; and spur, industrial, team, switching or side tracks located wholly within one State, which are left within state control"); Texas & Pac. Ry. v. Gulf, C. & S.F. Ry., 270 U.S. 266, 278, 46 S.Ct. 263, 266, 70 L.Ed. 578, 584 (1926) ("question whether the construction [of an intrastate trackage extension] should be allowed or compelled depends largely upon local conditions which the state regulating body is peculiarly fitted to appreciate"); Western & A.R.R. v. Georgia Pub. Serv. Comm'n, supra note 45, 267 U.S. at 496, 45 S.Ct. at 410, 69 L.Ed. at 756 (state's "requirement that ... [switching] service [on an industrial siding] not be discontinued without notice and hearing was clearly within the police power of the State"); Railroad Comm'n of California v. Southern Pac. Co., 264 U.S. 331, 345, 44 S.Ct. 376, 379, 68 L.Ed. 713, 718 (1924) ("exercise by a state commission of the power to direct the construction of merely local union stations or terminals without extensions of main tracks and substantial capital outlay [concededly may] be regarded as an ordinary exercise of the police power of the State for the public convenience"). Similarly, issuance of a certificate of abandonment of a line of railroad "terminates the Commission's jurisdiction," Hayfield N. R.R. v. Chicago & N.W. Transp. Co., supra note 39, 467 U.S. at 633-634, 104 S.Ct. at 2617, 81 L.Ed.2d at 537, and " 'the disposition of rail property after an effective certificate of abandonment has been exercised is a matter beyond the scope of the Commission's jurisdiction, and within a State's reserved jurisdiction.' " Id. at 634, 104 S.Ct. at 2617, 81 L.Ed.2d at 537 (quoting Abandonment of R.R. Lines and Discontinuance of Serv., 365 I.C.C. 249, 261 (1981))
 
 
 [49]
 Illinois Commerce Comm'n v. ICC, 242 U.S.App.D.C. 197, 200 n. 4, 749 F.2d 875, 878 n. 4 (1984), cert. denied, 474 U.S. 820, 106 S.Ct. 70, 88 L.Ed.2d 57 (1985) (while Staggers Rail Act "totally preempted State authority [over rail rates, classifications, rules and practices, where] ICC does not have jurisdiction to begin with ... State does, of course, have plenary power to regulate")
 
 
 [50]
 New Orleans Terminal Co. v. Spencer, supra note 13, 366 F.2d at 164 ("if [tracks] are spur, industrial, team, switching or side tracks, they are subject to valid state regulation"); Consolidated Rail Corp. v. Pennsylvania Pub. Util. Comm'n, 565 F.Supp. 153, 155 n. 5, 156 (Regional Rail Reorg.Ct.1983) ("state has exclusive power to regulate spur, sidetrack, industrial, team or switch lines wholly within one state" and "[a]bsent proceedings under [an act not applicable here] states are free to regulate the spur lines and require state approval for abandonment")
 
 
 [51]
 49 U.S.C. Sec. 10102(21) (1982 & Supp. V 1987) defines "railroad" as including both "the road used by a rail carrier and owned by it or operated under an agreement; and ... a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation."
 
 
 [52]
 Commission Decision, supra note 3, 3 I.C.C.2d at 369
 
 
 [53]
 Id
 
 
 [54]
 Cf. Louisiana Pub. Serv. Comm'n v. FCC, supra note 38, 476 U.S. at 374-375, 106 S.Ct. at 1901-1902, 90 L.Ed.2d at 385
 
 
 [55]
 Pub.L. No. 94-210, tit. VIII, Sec. 801(b), 90 Stat. 127
 
 
 [56]
 H.R.Rep. No. 1479, 94th Cong., 2d Sess. 22 (1976). The Senate bill did not contain a similar provision. The Conference Committee adopted the House provision. H.R.Conf.Rep. No. 1743, 94th Cong., 2d Sess. 49 (1976), reprinted in 1976 U.S.Code Cong. & Admin.News 5837, 5872. In the 1978 revision and codification of the interstate commerce laws, the provision was recodified as the present Sec. 10907(b)(1). Pub.L. No. 95-473, Sec. 10907(b)(1), 92 Stat. 1337, 1407 (1978)
 
 
 [57]
 Pub.L. No. 94-555, Sec. 218(a), 90 Stat. 2613, 2628 (1976)
 
 
 [58]
 Compare the original version, supra note 46, with the current version, supra note 2
 
 
 [59]
 49 U.S.C. Sec. 11501(b)(2) (1982)
 
 
 [60]
 Pub.L. No. 96-448, Sec. 214, 94 Stat. 1895, 1913-1914
 
 
 [61]
 Commission Decision, supra note 3, 3 I.C.C.2d at 371
 
 
 [62]
 49 U.S.C. Sec. 11501(b)(2) (1982)
 
 
 [63]
 Commission Decision, supra note 3, 3 I.C.C.2d at 371
 
 
 [64]
 Id
 
 
 [65]
 Id
 
 
 [66]
 See, e.g., H.R.Rep. No. 1035, 96th Cong., 2d Sess. 33-45, reprinted in 1980 U.S.Code Cong. & Admin.News 3978-3990
 
 
 [67]
 94 Stat. 1913
 
 
 [68]
 Save in subsection (b)(2), Sec. 11501 speaks constantly of "rates, classifications, rules, and practices," which, as the Commission has heretofore conceded, see text infra at note 73, is distinctly the language of ratemaking
 
 
 [69]
 See 49 U.S.C. Sec. 11501(b)(2)-(c) (1982). At the time of the Commission's decision in the case at bar, Illinois was provisionally certified under the Act. J.App. 290. Illinois is now fully certified. See Railroad Comm'n of Texas v. United States, 246 U.S.App.D.C. 352, 356-357, 765 F.2d 221, 225-226 (1985)
 
 
 [70]
 See, e.g., State Intrastate Rail Rate Authority--Texas, 1 I.C.C.2d 26 (1984); State Intrastate Rail Rate Authority--P.L. 96-448, 364 I.C.C. 881 (1981), 367 I.C.C. 149 (1983)
 
 
 [71]
 H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 105-106 (1980), reprinted in 1980 U.S.Code Cong. & Admin.News 4110, 4137-4138
 
 
 [72]
 Missouri Pac. R.R. Co.--Abandonment--Between Dearing and Dexter, Ks., I.C.C. Docket No. AB-3 (Sub-No. 25F), at 6-9 & n. 2 (May 26, 1981)
 
 
 [73]
 Id. at 6-7 & n. 2 (emphasis in original)
 
 
 [74]
 Southern Pac. Transp. Co.--Discontinuance of Passenger Train Serv., 1 I.C.C.2d 350, 352-354 (1984)
 
 
 [75]
 Mendocino Coast Ry.--Discontinuance--Mendocino County, Cal., I.C.C. Docket No. 30820 (Nov. 12, 1986)
 
 
 [76]
 Id. at 2 (footnote omitted) (emphasis in original)
 
 
 [77]
 Commission Decision, supra note 3, 3 I.C.C.2d at 371
 
 
 [78]
 Cheney Lime & Cement Co. v. Seaboard Sys. R.R., I.C.C. Docket No. 40037 (Feb. 4, 1987) at 4, on petition to reopen (Nov. 19, 1987) at 4-5
 
 
 [79]
 See text supra at note 71
 
 
 [80]
 Fourco Glass Co. v. Transmirra Corp., 353 U.S. 222, 228-229, 77 S.Ct. 787, 791-792, 1 L.Ed.2d 786, 790-791 (1957); FTC v. Manager, Retail Credit Co., 169 U.S.App.D.C. 271, 276, 515 F.2d 988, 993 (1975); see also, Aeron Marine Shipping Co. v. United States, 224 U.S.App.D.C. 373, 382, 695 F.2d 567, 576 (1982)
 
 
 [81]
 Mountain States Tel. & Tel. Co. v. Pueblo of Center Ana, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168, 179 (1985); FPC v. Panhandle E. Pipe Line Co., 337 U.S. 498, 514, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499, 1509 (1949); Atwell v. Merit Sys. Protection Bd., 216 U.S.App.D.C. 114, 128, 670 F.2d 272, 286 (1981); Citizens' to Save Spencer County v. EPA, 195 U.S.App.D.C. 30, 56, 600 F.2d 844, 870 (1979)